*293 Opinion
CANTIL-SAKAUYE, C. J.
In 1997, petitioner William Richards was convicted of the 1993 murder of his wife, Pamela. In 2012, by a four-to-three decision, this court rejected his claim on habeas corpus that his conviction should be overturned because the prosecution’s dental expert had recanted his expert opinion testimony at trial that a lesion on Pamela’s hand was a human bite mark matching petitioner’s unusual teeth. (In re Richards (2012) 55 Cal.4th 948 [150 Cal.Rptr.3d 84, 289 P.3d 860] (Richards I).) The majority concluded that the expert’s recantation did not constitute “false evidence” within the meaning of Penal Code section 1473 as the statute then read[1] because, in the absence of “a generally accepted and relevant advance in the witness’s field of expertise” or “a widely accepted new technology” that would allow “experts to reach an objectively more accurate conclusion,” petitioner had failed to show, by a preponderance of the evidence, that the expert’s opinion at trial was “objectively untrue.” (Richards I, supra, 55 Cal.4th at pp. 963, 966.) In 2014, however, the Legislature responded to our decision in Richards I by amending section 1473 to state that “ ‘false evidence’ shall include opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances.” (§ 1473, subd. (e)(1), as added by Stats. 2014, ch. 623, § 1.)
Petitioner has filed a new petition for writ of habeas corpus before this court in which he contends that, under the 2014 legislative revision of section 1473, he is now entitled to relief and that his conviction should be overturned. For the reasons discussed hereafter, we agree.
I. Statement of the Case
The San Bernardino County District Attorney charged petitioner with the August 10, 1993, murder (§ 187) of his wife, Pamela Richards.
Petitioner’s first two full trials ended in mistrials with hung juries. A third trial ended in a mistrial because the trial court recused itself during jury selection. In petitioner’s fourth trial, the jury announced it was deadlocked; it then received further instruction concerning reasonable doubt, after which the jury returned a conviction of first degree murder. The trial court sentenced petitioner to 25 years to life, and his conviction was affirmed on appeal in August 2000.
In 2007, petitioner filed a petition for writ of habeas corpus in the San Bernardino County Superior Court, asserting that his 1997 murder conviction *294 was based on false evidence and that new evidence unerringly established his innocence. The superior court issued an order to show cause and subsequently held an evidentiary hearing in 2009. At the conclusion of that hearing, the superior court granted the petition and vacated petitioner’s judgment of conviction.
The prosecution appealed, and the Court of Appeal reversed in November 2010. We granted review, and, as noted above, affirmed the Court of Appeal judgment by a four-to-three vote on December 3, 2012. (Richards I, supra, 55 Cal.4th 948.)
Following the Legislature’s 2014 amendment to section 1473, petitioner filed the present petition for writ of habeas corpus. We issued an order to show cause returnable before this court, and respondents, the Department of Corrections and Rehabilitation and the warden of the California facility at which petitioner is incarcerated, represented by the San Bernardino County District Attorney, have filed a return in opposition to the petition.[2]
II. Petitioner’s Jury Trial
The following evidence was presented at petitioner’s 1997 jury trial.
A. Petitioner’s relationship with his wife
Petitioner and his wife, Pamela, lived on a remote property they owned in the Mojave Desert in San Bernardino County. The plot had a small house and a camper parked nearby. They used a generator, kept in a small, fenced shed, for electricity. To access their home, one had to ascend a steep, sand-and-gravel driveway. The couple kept several dogs on the property to ward off intruders.
Petitioner and his wife had been having financial and marital difficulties, and both had sexual relationships outside the marriage. At the time of her death Pamela had been having a sexual relationship with Eugene Price, whom she had helped to recover from a helicopter accident. Pamela planned to leave petitioner and find an apartment with Price.
*295 B. The night of August 10, 1993
On the night of her death, August 10, 1993, petitioner was working a night shift. Price received a message from Pamela on his answering machine sometime between 7:00 and 7:30 p.m. At approximately 9:30 p.m., Price tried calling Pamela at the camper but received a busy signal. Price continued to try to call Pamela, calling approximately every five minutes, but he continued to receive a busy signal. Because of past problems with the telephone service in that area, Price contacted the phone company to check the line. Price continued to call Pamela, but without success.
At approximately 11:55 p.m., Price telephoned Pamela again, but this time petitioner answered. He sounded stressed and agitated. When Price asked for Pamela, petitioner said she was dead—and he told Price that her head was bashed in and her eye was hanging out of its socket. Price told petitioner to call 911.
At 11:58 p.m., petitioner called 911. In that call, petitioner stated he had just come home and discovered his wife was dead. He said he thought Pamela fell off the porch steps and hit her head.
Petitioner placed a second call to 911 at 12:06 a.m. In that call, petitioner asked when responders would arrive. He said that he thought that she had fallen, but that “things don’t look right here at all,” that “there’s things moved,” and that they should send someone who could examine the scene. The 911 operator assured petitioner that dispatch would send someone who could examine the scene and advised petitioner not to touch anything. Petitioner responded that he had not touched anything but the phone and the door and that he had rolled Pamela’s body over to see if she was all right.
Petitioner placed a third call to 911 at 12:33 a.m. In that call, he again asked when responders would arrive. He also stated that, when he went to start the generator, he observed blood and Pamela’s pants in that area and saw there was blood inside the camper. He stated his belief that Pamela had been attacked and killed near the generator because oil had been spilled there as well. Petitioner expressed anger as to why responders had not yet arrived. The dispatcher repeatedly advised petitioner not to touch anything and suggested he go sit in his car. Petitioner said he had not touched anything and that he would go sit with Pamela.
San Bernardino County Sheriff’s Deputy Mark Nourse arrived at the scene shortly after 12:30 a.m. The sky was overcast and the property was dark, with no light source. Deputy Nourse used his patrol vehicle lights and his flashlight to illuminate the scene.
*296 Petitioner led Deputy Nourse to Pamela’s body; the couple’s dogs acted aggressively toward Deputy Nourse as he approached. According to Deputy Nourse, it appeared that part of Pamela’s skull had been gouged out by some kind of blunt object and that pieces of her skull were nearby. One of her eyes was gouged out and an ear partially ripped off. Deputy Nourse could not detect a pulse. The body was neither warm nor cold. Her arm was pliable. Her blood was still wet, bright red, and puddled; it had not coagulated or soaked into the sandy soil. Based on his prior experience as a trained emergency medical technician and as a first responder firefighter, Deputy Nourse believed she had very recently died.
Petitioner began discussing the crime scene with Deputy Nourse. He told the deputy that Pamela was “stone cold dead” and that she must have been dead a long time because the battery in the camper had run out. Petitioner pointed out a cinder block that he said was used to kill her and stated there was also a stepping stone with blood on it. Petitioner gave his scenario concerning how he thought the assault and killing took place, including that he thought the attack had begun near the generator. According to Deputy Nourse, petitioner also said: “It don’t matter any, all the evidence that relates to this case I already touched and moved trying to figure out how this whole thing happened.” Deputy Nourse described petitioner’s demeanor as “very calm, cool, [and] collected,” but occasionally petitioner would fall to his knees crying, after which he would get back up and then continue talking. To the deputy, it seemed as if petitioner was speaking “like he had rehearsed or was reading from a script.”
Deputy Nourse became suspicious of petitioner and began surreptitiously recording their conversation. During this recording, petitioner explained that when he came home from work around midnight he found his wife lying facedown on the ground with her head against a cinder block. When he rolled her over in the dark, petitioner said that his fingers went into the hole in her head. Petitioner told Deputy Nourse that he initially thought that she had fallen and hit her head on the cinder block, but that he found blood on pillows inside the camper. Petitioner said that “things ain’t right here” and expressed anger that Pamela’s pants were lying next to the generator. He explained that Pamela “had to squeeze into those jeans” that morning because she had gained weight and that they would not have come off easily, adding, “trust me.” Petitioner stated that her underpants were inside the camper. He also stated that Pamela had placed the vacuum cleaner inside the camper and theorized that that she intended to start the generator so she could vacuum but was assaulted near the generator instead. Petitioner showed Deputy Nourse a spilled oil bottle the couple usually used to fill the generator before starting it. He stated that he knew there was “blood on rocks up against the hill,” and that there was a bloodstained paving stone that had been thrown “over the side of the hill.” Petitioner remarked that his dogs had failed to protect his *297 wife from her killer. He did not report anything missing from the premises. And he surmised that the killer had used a cinder block to kill Pamela.
Deputy Nourse directed petitioner to stay away from the crime scene while they waited for the homicide team to arrive. The homicide detectives did not arrive until 3:15 a.m. Because of the darkness, they decided not to process the crime scene until dawn. They tried but were unable to secure the couple’s dogs before leaving.
C. The crime scene
Detective Norman Parent, Criminalist Dan Gregonis, and Forensic Specialist Valerie Seleska began examining the crime scene at 6:00 a.m.
Approximately 25 feet away from Pamela’s body, near the small shed for the generator, there were bloodstains on the ground, on a gasoline container, and a bloodied rock, along with one of Pamela’s shoes. One of Pamela’s broken fingernails was also found in this area. In front of the generator was Pamela’s other shoe, her jeans, and a spilled bottle of oil. There was also blood spatter on the fencing surrounding the shed for the generator.
The team found Pamela’s body lying on its back, covered with a sleeping bag, on the ground between the camper and the house’s porch. Her right arm lay upon some heavy, metal-grate fencing material that lay flattened on the ground. She was naked from the waist down, except for socks. Her tank top had numerous bloodstains and blood spatter. Her head was crushed, an eye was hanging out, and a large pool of blood was beside her. The dogs had partially buried her head during the night.
A large, bloody cinder block was near her body and a bloody 12-by-12-inch stepping stone was a little further away on the edge of a slope. Based on the blood on them and their proximity to the body, Detective Parent believed that both the cinder block and stepping stone had been used to smash Pamela’s head.
The porch nearby had signs of blood spatter on it, as did the side and top of a table cart that was on the other side of her body. Stepping stones leading from the porch to the camper also had obvious blood spatter. The bottom of the entryway into the camper had blood smeared on it.
Inside the camper was a couch with pillows stacked on one end. The pillows had bloodstains on them as well as dirt and small pebbles. Detective Parent believed that Pamela had already been bleeding outside before she bled on the pillows in the camper. There was also a blood smear on a *298 telephone hanging on a wall. A vacuum cleaner stood upright in the middle of the floor, near her underpants, and was plugged in.
Pamela’s Suzuki Samurai was parked in front of the camper. On the passenger seat was Pamela’s purse, and it contained a letter signed and dated by petitioner nearly one month earlier in which petitioner proposed a division of their assets and personal property.
Detective Parent examined the area for tire tracks and was able to account for tracks left by the patrol vehicles, petitioner’s truck, and Pamela’s Suzuki. There was no evidence of any other tire tread marks. He also examined the area for shoe prints. He found three prints consistent with Pamela’s shoes, and one print consistent with petitioner’s shoes, which were very worn, with little tread. Other than these and the prints left by the officers, there were no other shoe prints. However, on several parts of the property, the soil was generally hard packed and not very conducive to retaining prints.
D. Petitioner’s interviews
Detective Tom Bradford interviewed petitioner for several hours on August 11, 16, and 30, and September 3, 1993. Petitioner’s statements in those interviews were generally consistent with what he had told Deputy Nourse at the crime scene. He also stated that he had been home approximately five to 10 minutes before Eugene Price called his home and petitioner told him that Pamela was dead. He explained that he and Pamela kept several guns on their property and that Pamela knew how to use them. Petitioner admitted that he knew Pamela was having sexual encounters with Price because she would tell him about them, which bothered him. He also admitted that he thought Pamela was going to leave him.
E. Autopsy evidence
Dr. Frank Sheridan, chief medical examiner for the Coroner’s Office of San Bernardino County, performed the autopsy on Pamela’s body. He determined that Pamela had been strangled, first unsuccessfully by ligature, and then manually. According to Dr. Sheridan, the strangulation was sufficient in itself to cause her death. In addition, the left side of her skull was smashed, which crushed her brain. According to Dr. Sheridan, this injury was also sufficient to cause her death. He believed that the strangulation came first and that Pamela was dead or nearly dead when the blunt force was inflicted because there was very little bleeding or bruising in the area of her skull injury.
Pamela’s body had several defensive wounds, and there was bruising across her body, and lacerations and abrasions to her face. There were no *299 signs of sexual assault. However, based on the significant blood spatter on her jeans and the lack of spatter on her bare legs, it appeared that someone had removed her pants after the blunt force was applied to her head.
Dr. Sheridan examined the lividity on the body. Lividity is the deep red-purple discoloration seen on a body after death, which is created when the heart stops beating and the blood settles down into the lowest parts of the body by way of gravity. Lividity becomes fixed on the body after six to 10 hours. According to Dr. Sheridan, if Pamela had died facedown, and stayed in that position for a few hours, but was later turned on her back, he would expect that the blood would drain toward her back, showing lividity there instead. At the crime scene, lividity was present on Pamela’s back, consistent with the body’s having lain on its back for several hours. However, the lividity was very weak, indicating she had lost a lot of blood as a result of her injuries.
Dr. Sheridan could give no opinion as to the time of death, and no liver temperature was taken when the officers first arrived at the crime scene. At the time, it was not standard practice for the coroner’s office to take a body’s liver temperature at the crime scene in order to estimate the time of death.
F. Petitioner’s clothing
Detectives collected the clothing that petitioner wore on the night of Pamela’s death. They also took pictures of his body and his arms and hands, none of which showed any fresh wounds, injuries, or other visible marks.
Criminalist Gregonis examined petitioner’s cotton shirt, jeans, and shoes for blood spatter. He found no blood spatter on petitioner’s shirt, but found blood transfer stains on the right collar and sleeve, consistent with petitioner’s account of cradling his wife’s head at the crime scene. Based on his experiments with a dummy head, however, Gregonis testified that he would have expected to see more blood transferred to petitioner’s shirt as a result of cradling a bloodied head, as well as blood dripped onto petitioner’s jeans, but the jeans contained no such drip patterns. Petitioner’s jeans had three small bloodstains that were consistent with Pamela’s blood and appeared to Gregonis to have been deposited as the result of blood spatter.[3] They were present in the right knee area, the right mid-thigh area, and to the left of the zipper, on the left leg. Blood consistent with Pamela’s was found on both of petitioner’s shoes, with blood on the left shoe’s toe area and blood spatter on the lacing of the right shoe.
*300 Although he initially expected to find much more blood on petitioner’s clothing, Gregonis surmised that the cinder block may have shielded petitioner from significant blood spatter due to its size.
G. Other forensic evidence
During the autopsy, Dr. Sheridan severed some of Pamela’s fingertips from her body for later testing. Criminalist Gregonis later examined the severed fingertips under a microscope and noticed blue cotton fibers wedged deep in a crack of a broken fingernail on one of the fingertips. The microscope was equipped with a video recording device, and Gregonis recorded a video of his extraction of the fibers from the fingernail. A matching broken fragment apparently torn from the same fingernail was found on the ground at the crime scene, suggesting that the fingernail broke during Pamela’s struggle with her assailant.
Gregonis examined the blue cotton shirt petitioner wore on the night of the killing, and he concluded that its blue fibers were indistinguishable from the fibers removed from the crack in Pamela’s broken fingernail. Gregonis, however, also acknowledged that cotton fiber is probably the most common fiber in the world, that blue cotton is common, and that there was nothing particularly unique about petitioner’s blue cotton work shirt.
Gregonis examined both the bloody cinder block and the bloody stone. The cinder block had hairs and a significant amount of blood spatter and areas of saturated blood on it, indicating that it was used to smash Pamela’s head. Based on the amount of blood also present on the stone, Gregonis believed that it too could have been dropped on or thrown at Pamela’s head.
H. Bite mark evidence
Specialist Valerie Seleska, who photographed the crime scene, also took photographs of Pamela’s autopsy. She took a photograph of a crescent-shaped lesion on Pamela’s right hand. Seleska acknowledged that if a body exhibited signs of a bite mark, it was standard practice to swab the suspected bite mark to collect any saliva. During the autopsy, she did not see anyone take a swab of the lesion on Pamela’s hand.
Ten days before petitioner’s final jury trial began in 1997, the San Bernardino County District Attorney’s Office contacted Dr. Norman Sperber, a dentist and forensic odontologist, to examine the photograph taken by Seleska at Pamela’s autopsy. Dr. Sperber testified that he had over 40 years of experience in dentistry. He explained that he was the chief forensic dentist for two counties—San Diego and Imperial. Dr. Sperber said that he was one of *301 100 people in the country certified in forensic odontologly by the American Board of Forensic Odontology. He had received a congressional appointment to set up a national system for identifying persons through dental records. Dr. Sperber had previously qualified as a forensic odontologist in 26 states in more than 100 cases, more than 80 of which involved bite mark evidence. He also described testifying as a forensic odontologist in the Jeffrey Dahmer case and in the Ted Bundy case, in which he matched a bite mark on one of the victims to Bundy.
As described hereafter, in explaining his conclusion that the photograph revealed that the lesion on Pamela’s hand was consistent with petitioner’s teeth, Dr. Sperber’s testimony was composed of a series of opinions and factual observations that integrated various exhibits.
First, Dr. Sperber opined that the lesion on Pamela’s hand was a bite mark. Second, he believed that the bite mark was of human origin. Third, Dr. Sperber testified that, based on the overall shape of the human bite mark, it was made from the lower teeth of the human jaw. Fourth, he believed that the human bite mark showed an abnormality—the presence of only one of the two canine teeth of the lower jaw. Fifth, he made a casting of petitioner’s teeth, took a photograph of the casting of petitioner’s lower jaw, enlarged the photograph of the victim’s bite mark to match the proportions of the photo of the lower jaw, drew a tracing of petitioner’s teeth on a transparency, and then overlaid that transparency over the enlarged photo of the bite mark. Dr. Sperber then stated that the overlaid transparency made a “pretty good alignment” with the photo of the bite mark.
In addition to his exhibits, Dr. Sperber explained why he believed petitioner’s lower teeth were consistent with the lesion on Pamela’s hand. According to Dr. Sperber, because one of petitioner’s canine teeth was “under-erupted” and crooked, it did not protrude as much as the other teeth on the jawline, and this circumstance could account for the missing canine mark on Pamela’s hand. He described the missing tooth mark as a “common sense expectation” or “common sense understanding” based on petitioner’s abnormal canine tooth. He further noted that whoever made the bite mark had something wrong with one of his canine teeth, as did petitioner. Dr. Sperber also noted that petitioner’s lower teeth were in an asymmetrical curve, with three teeth lined up straight, whereas a normal jaw would exhibit greater curvature of those teeth. He believed that characteristic was another factor showing a match with the bite mark photo.
Dr. Sperber explained that there were no studies in forensic odontology regarding the statistical rarity of an under-erupted canine tooth. When asked, based on his personal experience as a dentist, how often Dr. Sperber had *302 observed an under-erupted canine tooth in his patients, he explained that the under-eruption plus the asymmetry of petitioner’s teeth made petitioner’s teeth “even more unusual” and that he would expect “one or two or less” out of 100 people to have such features.
Dr. Sperber further explained that he uses four categories to assess bite mark evidence in order of increasing confidence of a match: “not consistent,” “consistent,” “probable,” and “reasonable doubt certainty.” Dr. Sperber explained that the angular distortion of the photo of Pamela’s lesion prevented his ability to classify his match with any degree of certainty greater than “consistent,” meaning that petitioner could have left the lesion and could not be ruled out.
I. Other evidence
The time clock at petitioner’s work indicated that he had left there at 11:03 p.m. on the night of the killing. A few weeks after the killing, a sheriff’s investigator went to petitioner’s place of employment. The investigator left petitioner’s workplace at 11:03 p.m., walked to his car in the parking lot, and then left the lot at 11:06 p.m. Although the posted speed limit was 55 miles per hour, the investigator that night was able to drive 75 miles per hour with the flow of traffic for most of the hip to petitioner’s property. Forty-one minutes later, he arrived at petitioner’s residence at 11:47 p.m.
J. Defense evidence
Wayne Kozica, Pamela’s brother, telephoned and spoke with her at approximately 7:15 to 7:30 p.m. on the night of her death, and she seemed normal at that time. Pamela had told Kozica that she and petitioner had been arguing, and Kozica offered to let her stay with him in San Diego.
Arthur Quas testified that he called petitioner’s residence but no one answered. According to Quas, he called just before 10:00 p.m. and the phone rang a few times followed by clicks and then a dial tone. He called again but the phone rang with no response. Quas was aware that petitioner and Pamela were in an open relationship and would have sexual affairs outside the relationship.
On three occasions, Christian Filipiak, a defense investigator, left the parking lot of petitioner’s place of employment at 11:06 p.m. and drove, at different speeds, the same route as petitioner did on the night of Pamela’s death. Driving with the cruise control set at 60, 65, and 70 miles per hour, it took Filipiak 52 minutes, 48 minutes, and 44 minutes, respectively, to arrive at the residence. The distance was 44.8 miles.
*303 Griffith Thomas, a physician specializing in pathology and forensic pathology, explained that time of death is a complex determination. Factors include rigor mortis, lividity, core body temperature, and environmental conditions. Depending on the ambient temperature, a dead body cools at a rate of one and a half to two degrees Fahrenheit per hour. According to Thomas, the closer to the time of death observations are made, the more accurate the findings will be. Thomas also stated that it was “outrageously wrong” for the investigation team to have waited till the next morning to dispatch a coroner’s investigator to examine Pamela’s body. As a result, he explained, it cannot be said when death occurred in this case. Thomas also believed that several of the wounds and bruises on Pamela’s body had been inflicted several hours before her death because of the advanced coloring of the contusions, which normally takes significant time to develop.
Dr. Gregory S. Golden, a dentist and chief odontologist for San Bernardino County, compared his own models of petitioner’s teeth with an enlarged, life-sized photograph similar to the autopsy photograph used by Dr. Sperber. Dr. Golden could not eliminate petitioner as a suspect, but then did further studies, by randomly using dental models of patients he had treated in the past. Out of 15 different dental models of patients he had treated, Dr. Golden found five dental models whose teeth appeared to match the lesion on the photograph. Accordingly, Dr. Golden believed that the bite mark evidence should be disregarded because of the generic nature of the bite and the low quality of the photograph. On cross-exantination, however, Dr. Golden also stated that petitioner’s under-erupted, displaced canine was “unique” and that “there is a very low probability that you are going to find an individual with a tooth in that position in the same orientation down to maybe two percent of the population, if that.”
Dean Gialamas, senior criminalist with the Los Angeles County Sheriff’s Department, testified regarding his examination of the bloodstains on petitioner’s clothes. Gialamas explained that he had been trained in blood spatter interpretation and has presented papers on the subject. He had received awards from regional and international associations for his achievements in criminalistics. Although he testifies for the prosecution about 75 percent of the time, Gialamas stated that he had been appointed to examine the evidence for the defense in the present case.
Gialamas examined the photographs of the crime scene with special attention to the blood spatter around Pamela’s body, noting that the blood had radiated out in numerous directions. He stated that he would have expected to see multiple blood patterns on the person who dropped the cinder block on Pamela’s head. In his assessment, Pamela’s head suffered at least three blows, based on her wounds and the fact that she had to have sustained an open, bleeding wound for the spattering to be generated.
*304 Gialamas conducted and videotaped multiple experiments in which he dropped a cinder block on a sponge shaped into a dummy head and soaked with human blood. The blood spatter invariably came back toward him in the lower leg to thigh area, despite the cinder block’s shielding of some of the spatter. In another experiment, the blood spatter reached as high as his shirt collar. Although he was wearing gloves, the rough edges of the cinder block cut his hand.
Gialamas also conducted experiments using bloodied hair being dragged across the laces of a canvas shoe like the one petitioner wore the night of Pamela’s death. The contact transfer of blood from the hair to the shoe created a pattern similar to those found on the laces of petitioner’s right shoe, creating a pattern that looked very similar to blood spatter. Gialamas could not rule out either the transfer of blood from hair or blood spatter as the origin of the bloodstains found on the laces of petitioner’s right shoe but found it odd that the dots of spatter on petitioner’s shoe lined up in a straight row, as opposed to being randomly deposited. Gialamas testified that the bloodstains found on the toe portion of petitioner’s left shoe had no characteristics of spatter, but was simply a contact-type transfer stain. Gialamas further believed that the blood pattern on the shoes were inconsistent with the extensive spattering that occurred in his cinder block experiments.
Gialamas also examined the three areas of petitioner’s jeans that Gregonis testified had signs of blood spatter. Gialamas concluded the bloodstains on the right knee area were transfer stains consistent with the wearer’s kneeling on some kind of blood source, perhaps bloody gravel, because the stains in that area varied in size, shape, and intensity. Regarding the bloodstain found on the right upper thigh, Giamalas testified that the stain looked more like a transfer stain, but could not rule out that it was “an oddball fly-off medium energy spatter.” Regarding the bloodstains to the left of the zipper, Gialamas believed they were transfer stains because the stains went along the rise of three natural creases on that area of the pants, which would mimic spatter stains once flattened out. But he also could not rule out that they were created by spatter because it was remotely possible that the three drops of spatter precisely landed on the crease areas.
Gialamas examined petitioner’s shirt and found no evidence of blood spatter. In his opinion, the evidence on petitioner’s shirt was more consistent with the wearer’s cradling a bloodied head. He also testified that blue cotton is not uncommon, and that cotton is “the most ubiquitous fiber we have.”
In sum, Gialamas concluded: “Given the lack of spatter on [petitioner’s] clothing, no, I don’t think that this clothing is consistent with this individual being the perpetrator.”
*305 III. 2007 Through 2009 Habeas Corpus Proceedings
In 2007, petitioner sought a writ of habeas corpus in the San Bernardino County Superior Court, claiming that his 1997 murder conviction was based on false evidence and that new evidence unerringly established his innocence. Petitioner also presented evidence challenging the blue cotton fibers found under Pamela’s fingernail and presenting new DNA evidence taken from the cinder block and from a hair found under one of Pamela’s fingernails. (See Richards I, supra, 55 Cal.4th at pp. 958-959.) But these facts are not related to petitioner’s false evidence claim raised in his current petition for writ of habeas corpus. Accordingly, we will focus only on the significance of the prosecution expert’s recantation of his trial testimony concerning bite mark evidence.
The 2007 petition included a declaration from Dr. Sperber, the prosecution’s forensic dentist at petitioner’s jury trial, in which he repudiated his testimony at trial that only 1 or 2 percent of the population had petitioner’s dental irregularity. According to Dr. Sperber’s declaration: “These percentages were based on my own experience and were not scientifically accurate.” He added: “With the benefit of all of the photographs [of the crime scene and Pamela’s injuries], and with my added experience, I would not now testify as I did in 1997,” and “I cannot now say with certainty that the injury on the victim’s hand is a human bite mark injury.”
The 2007 petition also included declarations and reports by other experts in the field of forensic dentistry. Dr. Golden, the defense forensic dentist at petitioner’s jury trial, declared that he “enlarged the image [of Pamela’s hand lesion] to life-size” and that after comparing the enlarged image to petitioner’s teeth, he “would tend to exclude [petitioner] as the suspected biter.” In his declaration, Dr. Charles M. Bowers described how he and Dr. Raymond J. Johansen had used computer software to remove the angular distortion from the photograph of Pamela’s hand lesion, thereby allowing a more accurate comparison between the lesion and petitioner’s lower teeth. According to Dr. Bowers’s declaration, “The new scientific methods demonstrably contradict the conclusion at trial that [petitioner] could not be ruled out as a suspected biter.” Dr. Bowers was also critical of the methodology used by Dr. Sperber at petitioner’s trial. In an earlier report, Dr. Bowers wrote that there is “significant doubt that the hand injury is even a bitemark.”
After the superior court issued an order to show cause, the court received further briefing and eventually held an evidentiary hearing in 2009 in which the forensic dentists testified consistently with their declarations. In addition to the points made in his posttrial declaration, Dr. Sperber described the angular distortion in the photograph of the lesion on Pamela’s hand and *306 stated that he had examined autopsy photographs depicting other lesions on Pamela’s body. Concerning the autopsy photograph of the lesion on Pamela’s hand, Dr. Sperber explained: “I don’t know for sure that . . . that photograph depicts a bite mark.” He added: ‘“My opinion today is that [petitioner’s] teeth ... are not consistent with the lesion on the hand.” Dr. Golden also testified consistently with the points in his declaration. He concluded that the lesion was not from petitioner’s teeth and speculated that it might have been a dog bite or from some other source.
Drs. Bowers and Johansen both explained how they used computer software to digitally correct the photograph of Pamela’s hand by removing angular distortion. They testified that they are experts in this process and have published articles and a book on the digital analysis of bite mark evidence. They explained that the technique was first used in 1996 or 1997 by a doctor in Canada. But Drs. Bowers and Johansen further developed the precision of the technique to correct angular distortion in photographs, and their method has become accepted in the field of forensic dentistry.
After correcting the angular distortion in the autopsy photograph, Dr. Johansen created outlines depicting petitioner’s lower and upper teeth. He concluded that petitioner’s lower teeth did not match the lesion on Pamela’s hand because it was obvious to him ‘“that this mark, if indeed a bite mark, was more likely to have been made by an upper arch.” Using an outline of petitioner’s upper teeth, Dr. Johansen concluded the upper teeth matched the lesion in some places, but not others. Dr. Johansen could not exclude petitioner’s teeth as a possible source of the lesion, but in his opinion it was just as likely that the indistinct lesion was caused by the fencing material under Pamela’s right arm as it was by petitioner’s teeth. Dr. Johansen conceded, however, that he had removed angular distortion from the same photograph in 2000, and had concluded at that time that the lesion was a human bite mark that was consistent with petitioner’s teeth.
Dr. Bowers testified that he also corrected the angular distortion from the autopsy photograph and compared the corrected photograph to a digital exemplar of petitioner’s lower teeth. After superimposing the image of petitioner’s lower teeth to the corrected autopsy photograph, he found no match. According to Dr. Bowers, the lesion was 11 millimeters shorter than petitioner’s lower teeth, and three of his teeth did not align with the lesion. Dr. Bowers examined photographs of other lesions on Pamela’s body that appeared to have been caused by the metal fencing on the ground and doubted whether the hand lesion was a human bite mark, believing that it might have been left by the fencing material under her right arm.
At the conclusion of the hearing, the superior court granted habeas corpus relief, concluding that the new evidence unerringly established petitioner’s *307 innocence and ordered that petitioner be remanded for a new trial. The People appealed the trial court’s decision and the Court of Appeal, after briefing and argument, vacated the superior court’s order granting the petition for a writ of habeas corpus. We granted petitioner’s petition for review in 2011.
IV. The Richards I Decision
Section 1473, subdivision (b) provides in relevant part: “A writ of habeas corpus may be prosecuted for, but not limited to, the following reasons: [¶] (1) False evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at a hearing or trial relating to his or her incarceration.” If a petitioner fails to show that false evidence affected the outcome of petitioner’s trial, a petitioner may present new evidence to challenge the conviction, but in order to prevail, “ ‘such evidence, if credited, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability.’ [Citation.]” (In re Clark, supra, 5 Cal.4th 750, 766.)
Prior to 2014, section 1473 did not specifically provide guidance as to the meaning of ‘“false evidence” for purposes of determining falsity, but we interpreted section 1473 to require a petitioner to show that the evidence was false by ‘“a preponderance of the evidence.” (In re Malone (1996) 12 Cal.4th 935, 962 [50 Cal.Rptr.2d 281, 911 P.2d 468] (Malone), citing In re Sassounian (1995) 9 Cal.4th 535, 546 [37 Cal.Rptr.2d 446, 887 P.2d 527] [a petitioner “ ‘bears the burden of proving’ ” those facts supporting the petition for habeas corpus “ ‘by a preponderance of the evidence’ ”].) In Richards I, we were presented with the question of alleged falsity concerning expert witness testimony in the context of Dr. Sperber’s recanted trial testimony regarding the lesion on Pamela’s hand and whether it matched petitioner’s teeth. As previously described, in Richards I this court split four to three on the issue of whether petitioner had shown that Dr. Sperber’s trial testimony was false evidence within the meaning of section 1473.
The majority in Richards I held that if an expert witness’s opinion given at trial later changes, without any significant advances in the expert’s field of expertise or in any technologies employed by the expert, ‘“it would not be accurate to say that the witness’s opinion at trial was false.” (Richards I, supra, 55 Cal.4th at p. 963.) The majority reasoned that the fact that an expert recants an opinion given at trial does not necessarily establish that the opinion at trial was false. Instead, the expert’s change in opinion ‘“has merely demonstrated the subjective component of expert opinion testimony.” (Ibid.) The majority concluded that the ‘“false evidence” standard under section 1473 as it then read was satisfied ‘“[i]f, and only if, a preponderance of the evidence shows that an expert opinion stated at trial was objectively untrue.” (Richards I, at p. 963.)
*308 For purposes of petitioner’s case, the majority recognized that new technology that was not available at the time of petitioner’s 1997 trial had been applied to remove the angular distortion from the autopsy photograph, but it concluded that the new technology failed to prove “that any portion of Dr. Sperber’s trial testimony was objectively untrue.” (Richards I, supra, 55 Cal.4th at p. 965.) The majority explained that petitioner’s experts at the habeas corpus hearing had merely cast doubt on Dr. Sperber’s trial testimony and that “these experts still could not definitively rule out petitioner’s teeth as a possible source of the mark” on Pamela’s hand, thus failing to prove that Dr. Sperber’s opinion at trial was “objectively untrue.” (Id. at pp. 965-966, italics omitted.) Accordingly, the majority concluded, petitioner had not shown that Dr. Sperber’s testimony was false for purposes of applying the standard of review for false evidence under section 1473. (Richards I, at p. 966.) Instead, the majority held that Dr. Sperber’s recantation and the evidence presented by the other forensic dentists must properly be reviewed under the more demanding standard applicable to new evidence, and concluded that this new evidence did not “ ‘unerringly’ ” establish petitioner’s innocence and thus did not support setting aside the challenged conviction. (Id. at p. 968, quoting In re Clark, supra, 5 Cal.4th at p. 766.)
The dissenting opinion in Richards I criticized the majority for treating the recantation of expert testimony differently from the recantation of lay testimony for purposes of section 1473, maintaining that the statute “makes no distinction between lay and expert testimony.” (Richards I, supra, 55 Cal.4th at p. 972 (dis. opn. of Liu, J.).) The dissent noted that prior case law had established that lay testimony can be deemed false merely if the witness recants his or her prior testimony, whether or not other evidence demonstrated “the truth or falsity of the ultimate fact to which the witness testified.” (Id. at p. 973 (dis. opn. of Liu, J.), citing In re Hall (1981) 30 Cal.3d 408 [179 Cal.Rptr. 223, 637 P.2d 690] [granting relief where the trial witnesses later recanted their prior eyewitness identification of petitioner as the gunman].) According to the dissent, “[t]here is no reason to treat expert testimony differently” because “[j]ust as the truth or falsity of eyewitness testimony under section 1473(b) depends on the truth or falsity of underlying facts concerning the witness’s perceptual abilities, the truth or falsity of expert testimony depends on the truth or falsity of underlying facts essential to the expert’s inferential method and ultimate opinion.” (Richards I, at p. 973 (dis. opn. of Liu, J.).) The dissent further explained that Dr. Sperber’s perception of whether petitioner’s lower teeth were consistent with the lesion on Pamela’s hand was based on an autopsy photograph that had not been corrected for angular distortion. The dissent observed that all of the petitioner’s experts on habeas corpus now agreed that the autopsy photograph, when the angular distortion was corrected, either excluded petitioner’s teeth as the source of the lesion or was simply too poor to serve as a basis on which to *309 make any conclusion regarding a match. (Richards I, supra, 55 Cal.4th at pp. 974-975 (dis. opn. of Liu, J.).) According to the dissent, “the critical underlying fact—that the single uncorrected photograph provided Dr. Sperber with a sufficient basis for matching petitioner’s teeth to a lesion on the victim’s hand—was proven false.” (Id. at p. 975 (dis. opn. of Liu, J.).) The dissent further asserted that, just as lay eyewitness testimony can be false “because it depended crucially on the witnesses having seen something that it turns out they did not actually see, the expert testimony here was false because it depended crucially on Dr. Sperber having seen something—a true photographic representation of the lesion on the victim’s hand—that it turns out he did not actually see.” (Id. at pp. 975-976 (dis. opn. of Liu, J.).) The dissent concluded that because petitioner had “shown by a preponderance of the evidence that the essential premise of Dr. Sperber’s trial testimony was false, it follows that the testimony was false evidence under section 1473(b).” (Id. at p. 976 (dis. opn. of Liu, J.).) Applying the standard of review applicable to false evidence under section 1473, the dissent concluded that, because there was a reasonable probability that the false evidence affected the outcome of petitioner’s trial, the conviction should be set aside. (Richards I, at p. 982 (dis. opn. of Liu, J.).)
V. Discussion
A. The 2014 revision of the definition of false evidence for purposes of expert opinion under section 1473
After this court’s decision in Richards I, the Legislature enacted Senate Bill No. 1058 (2013-2014 Reg. Sess.), which added subdivision (e)(1) to section 1473. That provision now states in full: “For purposes of this section, ‘false evidence’ shall include opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances.” (§ 1473, subd. (e)(1).)
The plain meaning of the amendment to section 1473 makes clear that an expert opinion given at trial can later be deemed “false evidence” under two circumstances: (1) if the expert repudiates his or own opinion given at trial or (2) if the opinion given at trial is undermined by subsequent “scientific research or technological advances.” (§ 1473, subd. (e)(1).) We conclude that, under this amendment to section 1473, petitioner has met his burden to show that Dr. Sperber’s trial testimony constituted false evidence under either circumstance.
First, Dr. Sperber clearly repudiated his trial testimony. In the habeas corpus proceedings, Dr. Sperber testified that he no longer was certain that *310 the autopsy photograph depicted a human bite mark, stating, “I don’t know for sure that . . . that photograph depicts a bite mark.” He also repudiated his trial testimony concerning whether petitioner’s teeth were consistent with the lesion depicted on the autopsy photograph, stating, ‘“My opinion today is that [petitioner’s] teeth ... are not consistent with the lesion on the hand.” Because section 1473 as amended in 2014 states false evidence is established when an expert’s trial testimony has ‘“been repudiated by the expert who originally provided the opinion,” petitioner has shown through Dr. Sperber’s subsequent testimony during the 2009 proceedings on habeas corpus that Dr. Sperber’s testimony was false. (§ 1473, subd. (e)(1).)
Second, the evidence petitioner presented in the prior habeas corpus proceedings also established that new technological advances undermined Dr. Sperber’s trial testimony. Technology that was not available at the time of petitioner’s 1997 jury trial was used to correct the angular distortion of the lesion depicted in the autopsy photograph. That corrected photograph informed the opinions of the experts at the habeas corpus proceedings.
In light of the corrected photograph, Dr. Sperber and Dr. Golden testified that they would exclude petitioner’s teeth as the source of the lesion. Dr. Bowers noted that the length of the lesion in the corrected autopsy photograph was inconsistent with the size of petitioner’s lower teeth and that three of petitioner’s teeth did not match the lesion, and he expressed doubt whether the lesion was a bite mark at all. After examining the corrected photograph and photographs of other lesions on Pamela’s body, Dr. Johansen testified that, because of the poor quality of the autopsy photograph, he could not include or exclude petitioner’s teeth as the source of the mark and that it was just as likely that the lesion was created by the fencing material and not a bite.
As a result, petitioner has shown that Dr. Sperber’s trial testimony constituted false evidence because that opinion has ‘“been undermined by later scientific research or technological advances.” (§ 1473, subd. (e)(1).) The legislative history of the 2014 amendment of section 1473 bolsters our interpretation of that section. (Briggs v. Eden Council for Hope & Opportunity (1999) 19 Cal.4th 1106, 1120 [81 Cal.Rptr.2d 471, 969 P.2d 564].)
An Assembly committee analysis of Senate Bill No. 1058 (2013-2014 Reg. Sess.) stated that the impetus for the bill was the issue addressed in Richards I, supra, 55 Cal.4th 948: ‘“The 4-3 majority in Richards held that expert opinion stated at trial is ‘false evidence’ supporting . . . habeas relief if the expert’s conclusion is proved to be objectively untrue.” (Assem. Com. on Public Safety, Analysis of Sen. Bill 1058 (2013-2014 Reg. Sess.) as amended June 4, 2014, p. 5 (Assembly Analysis).) The analysis included a detailed *311 summary of the facts of the case, described the positions of the majority and dissent, and concluded by stating: “This bill specifies that ‘false evidence’ for purposes of prosecuting a writ of habeas corpus, includes opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances. This bill removes the distinction between testimony by lay witnesses and testimony of experts created by the Richards decision but still requires that the court make a finding that it is reasonably probable that the verdict at trial would have been different without the expert’s testimony before granting habeas relief.” (Assem. Analysis, supra, as amended June 4, 2014, p. 6.)
Similarly, a Senate committee analysis of Senate Bill No. 1058 (2013-2014 Reg. Sess.) stated: “The issue this bill seeks to address was clearly depicted in the California Supreme Court case, In re Richards, [supra,] 55 Cal.4th 948 .... The Richards 4-3 majority upheld petitioner’s conviction, holding that ‘expert testimony’ is different from other types of testimony in that it is merely the opinion of the expert, not evidence in and of itself, and so can never be ‘true’ or ‘false.’ Because of this, the court found Richards had failed to establish the falsity of the original expert testimony, which had served as the basis for his conviction. The Richards dissent, written by Justice Liu, pointed out the injustice of the majority opinion; noting that the false evidence statute Penal Code Sec. 1473(b), used by the majority, did not make a distinction between lay and expert testimony, but that the majority’s opinion placed a heavier burden on any petitioner seeking relief from false evidence presented by expert testimony. Liu noted that there is no reason to treat the two types of testimony differently because, just as the truth or falsity of the eyewitness testimony under [Section] 1473(b) depends on the truth or falsity of the underlying facts concerning their perceptual abilities, so too does the truth or falsity of the expert’s testimony depend on the underlying facts essential to the expert’s inferential method and opinion.” (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 1058 (2013-2014 Reg. Sess.) as amended June 4, 2014, p. 3.)
From this legislative history, it is apparent that the Legislature agreed with the dissent’s conclusion in Richards I, supra, 55 Cal.4th 948. The Senate committee analysis supports the notion that the Legislature intended courts to treat lay and expert opinion equally in determining whether the testimony of an expert witness at trial satisfies the false evidence language of section 1473.
Accordingly, we conclude that petitioner has shown that Dr. Sperber’s trial testimony that the lesion on Pamela’s hand was consistent with the assertedly unusual dentition of petitioner’s lower teeth constituted “false evidence” within the meaning of section 1473 as amended in 2014.
*312 B. False evidence and the sufficiency of the evidence
The San Bernardino County District Attorney does not extensively discuss whether Dr. Sperber’s trial testimony constitutes false evidence for purposes of section 1473. Rather, the district attorney primarily argues that petitioner’s claim of false evidence concerning Dr. Sperber’s trial testimony is an attempt to present a sufficiency of the evidence claim, which is a type of claim not cognizable on a petition for writ of habeas corpus. (See In re Lindley (1947) 29 Cal.2d 709, 723 [177 P.2d 918] [“Upon habeas corpus, ... the sufficiency of the evidence to warrant the conviction of the petitioner is not a proper issue for consideration”].) The district attorney contends that petitioner’s claim is not cognizable because if Dr. Sperber’s trial testimony is eliminated from consideration, the remainder of the evidence admitted against petitioner must be considered in evaluating his guilt and such reweighing of the evidence would amount to nothing more than a sufficiency of the evidence claim.
This contention is based on a misunderstanding of the standard that section 1473 establishes for determining when relief on habeas corpus is available upon a showing that false evidence was admitted at trial. The statute and the prior decisions applying section 1473 make clear that once a defendant shows that false evidence was admitted at trial, relief is available under section 1473 as long as the false evidence was “material.” Our case law further explains that false evidence is material “ ‘if there is a “reasonable probability” that, had it not been introduced, the result would have been different.’ ” (In re Roberts (2003) 29 Cal.4th 726, 742 [128 Cal.Rptr.2d 762, 60 P.3d 165].) The remedial purpose of the statute is to afford the petitioner relief if the “false evidence [was] of such significance that it may have affected the outcome of the trial . . . .” (In re Wright (1978) 78 Cal.App.3d 788, 808-809 [144 Cal.Rptr. 535].) Thus, the crucial question is whether the false evidence was material—not whether, without the false evidence, there was still substantial evidence to support the verdict.
Our courts have held that “ ‘[f]alse evidence is “substantially material or probative” if it is “of such significance that it may have affected the outcome,” in the sense that “with reasonable probability it could have affected the outcome . . . .” [Citation.] In other words, false evidence passes the indicated threshold if there is a “reasonable probability” that, had it not been introduced, the result would have been different. [Citation.] The requisite “reasonable probability,” we believe, is such as undermines the reviewing court’s confidence in the outcome.’ ” (Malone, supra, 12 Cal.4th at p. 965, italics added by Malone, quoting In re Wright, supra, 78 Cal.App.3d 788, 814.) This required showing of prejudice is the same as the reasonably probable test for state law error established under People v. Watson (1956) 46 *313 Cal.2d 818, 836 [299 P.2d 243], (Wright, supra, 78 Cal.App.3d at p. 812.) We make such a determination based on the totality of the relevant circumstances. (Malone, supra, 12 Cal.4th at p. 965.)
Accordingly, we will apply this standard to determine whether the false evidence was substantially material and probative on the issue of petitioner’s guilt.
C. Reasonable probability that the false evidence affected the outcome
Dr. Sperber’s qualifications were impressive. At the time of petitioner’s 1997 jury trial, Dr. Sperber had more than 40 years of experience in dentistry, which included being the chief forensic dentist for two counties. He had testified in more than 100 cases, including well-known high profile cases. He also received a congressional appointment to set up a national system to identify missing persons through dental records. Dr. Sperber’s credentials very likely added to the credibility of his testimony.
It is important to note that Dr. Sperber not only testified that he believed the lesion on Pamela’s hand was consistent with the unusual dentition of petitioner’s lower teeth, he also prepared an exhibit. On a poster board, Dr. Sperber assembled an enlarged photo of the autopsy photograph depicting Pamela’s lesion, a photo of petitioner’s lower jaw casting, and a transparency tracing of petitioner’s lower canine and incisor teeth. He taped the transparency between the two photos so that the transparency tracing could be flipped back and forth between the two photos for purposes of visualizing the match. This exhibit and the casting of petitioner’s teeth were admitted in evidence and given to the jury during its deliberations.
Although in Richards I, supra, 55 Cal.4th 948, we characterized the evidence against petitioner as strong, we did so in the context of whether the evidence was strong enough to overcome any suggestion that evidence discrediting Dr. Sperber’s conclusion pointed “unerringly” to petitioner’s innocence. Now, however, we must decide whether the evidence is strong enough to rule out a reasonable probability that the admission of Dr. Sperber’s trial testimony affected the outcome of the case. In that context, the case against petitioner was entirely based on circumstantial evidence, and much of that evidence was heavily contested. Upon exantination of this circumstantial evidence admitted against petitioner, it appears that Dr. Sperber’s testimony was “material” for purposes of section 1473.
Assuming that, like the prosecution’s investigator, petitioner was able to drive 20 miles per hour over the speed limit on the night of the killing, *314 petitioner would have had anywhere from only eight to 11 minutes to kill the victim, depending on whether Eugene Price’s phone call or petitioner’s first call to 911 is used as the time reference for when the attack on Pamela was completed. If petitioner drove 10 miles per hour over the speed limit on his way home that night, then he would have had anywhere from only one to four minutes to kill the victim. According to the county’s chief medical examiner, Dr. Sheridan, death by strangulation alone can take anywhere from two and a half to three minutes.
Although some parts of the property contained looser soil that was amenable to shoe prints, the fact that shoe prints of only the victim and petitioner were found at the crime scene is not remarkable, given that some of the landscape was generally not conducive to creating shoe prints. In fact, only four shoe prints were found at the crime scene, with three of them belonging to Pamela—despite evidence that she was chased around the crime area.
Petitioner’s familiarity with the crime scene and with what items were used to strike Pamela may appear suspicious in the abstract, but he had had to wait for more than a half-hour before Deputy Nourse arrived. It is not unreasonable to conclude that petitioner, while waiting for the police to arrive, explored the area to determine how his wife died. Moreover, when Detective Parent examined the crime scene, it was readily apparent to him that both the cinder block and stone had been used to hit Pamela in the head because those items were covered with blood and blood spatter. In fact, he agreed that it did not take a “rocket scientist” for someone to make such a conclusion.
The time of death was a significant issue at trial. It is undisputed that there was no evidence definitively establishing that point. But evidence suggested that Pamela stopped answering her phone hours before petitioner arrived. Although Deputy Nourse, upon examining Pamela’s body, believed she had very recently died because the body still had wet puddled blood around it and no rigor mortis, he described her body as neither warm nor cold. Both the prosecution and defense forensic pathologists agreed that, after death, the body cools at a rate of one and a half degrees to two degrees Fahrenheit per hour with some variance depending on the environmental conditions, the weight of the body, and the circumstances leading to death. Thus, if Pamela had died an hour before petitioner arrived, Deputy Nourse’s observation that her body was neither warm nor cold might be consistent with that hypothesis because he arrived less than an hour after petitioner did.
The fact that there were no visible, fresh injuries on petitioner’s face, arms, and hands on the night of the killing was also unusual. The scene of the crime established that Pamela fought her attacker. Two of her fingernails were torn *315 off during the attack. Her body had numerous premortem bruises and lacerations. There was evidence she was assaulted outside first and then brought inside the camper where she bled on pillows. Pamela was strangled first by ligature and then manually. The presence of blood in multiple locations further suggested that Pamela tried to fight off and flee her attacker. However, petitioner’s body showed no evidence of a recent physical altercation.
Even more unusual was the evidence of blood on petitioner’s clothing. The few stains that the prosecution’s expert identified as blood spatter on petitioner’s shoes and jeans were millimeter sized. But the area around Pamela’s body exhibited a radial spray of significant blood spatter, much of which was centimeter sized. More important, the defense expert provided evidence that the alleged blood spatter on petitioner’s jeans and shoes could have been the result of transfer scenarios that were consistent with petitioner’s claim that he had cradled Pamela’s head at the scene. The expert believed the assailant’s clothes would have displayed far more blood spatter than was found on the clothing petitioner wore on the night of the killing. As a result, the defense expert believed that petitioner’s clothing was not consistent with his being the perpetrator.
Accordingly, with the exception of the bite mark evidence, the defense had a substantial response to much of the prosecution’s evidence against petitioner. Under these unique circumstances, it is reasonably probable that the false evidence presented by Dr. Sperber at petitioner’s 1997 jury trial affected the outcome of that proceeding.
VI. Disposition
The petition for writ of habeas corpus is granted.[4] The judgment of the San Bernardino County Superior Court in People v. William Richards, No. SWHSS700444, is vacated.
Werdegar, J., Chin, J., Corrigan, J., Liu, J., Cuéllar, J., and Kruger, J., concurred.

 Unless otherwise noted, all further statutory references are to the Penal Code.

 In their return, respondents do not dispute petitioner’s reliance on the record of the 2009 habeas corpus evidentiary hearing to support the claims raised in the present petition. Although we are not aware of any previous habeas corpus proceeding presenting a comparable procedural history and setting, in the absence of any contention that the testimony at the prior evidentiary hearing does not provide a proper basis for resolving the issues presented in the present habeas corpus petition, we shall resolve the petition on that basis. Because of the change in the applicable law concerning the definition of false evidence, the petition is not subject to the procedural bar of successiveness. (In re Clark (1993) 5 Cal.4th 750, 767 [21 Cal.Rptr.2d 509, 855 P.2d 729].)

 There were other small bloodstains on petitioner’s jeans, but they were either consistent with petitioner’s blood or were too small to return any DNA tests results.

 On November 6, 2015, petitioner filed a motion for release on unscheduled bail amount or own recognizance pending determination on merits of petition for writ of habeas corpus and a motion to expedite case and for calendar preference. In light of the disposition of the petition for writ of habeas corpus, both are dismissed as moot.